UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| NELSON SALISBURY, et al.,<br><br>Plaintiff(s),<br>v.<br><br>COSTCO WHOLESALE CORPORATION,<br><br>Defendant(s). | CASE NO. C25-2277-KKE<br><br>ORDER GRANTING MOTION TO DISMISS WITH PREJUDICE AND GRANTING IN PART AND DENYING IN PART MOTION FOR JUDICIAL NOTICE |

In this putative class action, Plaintiffs allege that Defendant Costco Wholesale Corporation ("Costco") defrauded millions of consumers throughout the United States by selling adulterated Tequila under a false "100% de Agave" label. Plaintiffs, on behalf of a proposed class, assert claims under the Racketeering Influenced and Corrupt Organization Act ("RICO"), a nationwide class under the Washington Consumer Protect Act, and various state law classes based on the residences of the named Plaintiffs. Dkt. No. 25 ¶ 18. Presently before the Court is Costco's motion to dismiss the amended class action complaint, as well as Costco's motion for judicial notice of various exhibits, and its notice of intent to rely on foreign law. The motions have been fully briefed, and the Court has considered the oral argument of counsel. Dkt. Nos. 25, 31–32, 36–37, 42–43, 48. For the reasons below, the Court grants Costco's motion for judicial notice in part and denies it in part and grants the motion to dismiss with prejudice.

## I. BACKGROUND[1]

This case centers on five Kirkland Tequila products sold by Costco—Blanco, Reposado, Añejo, Cristalino, and Extra Añejo ("collectively, the "Kirkland Tequila Products," or "the Products")—each bearing the representation "100% de Agave." Dkt. No. 25 ¶¶ 6, 66. Costco represents on the face of its bottles that the Products are "Hecho en Jalisco, Mexico," which means "made in Jalisco, Mexico," and that the Products are made "using 100% Blue Agave." *Id.* ¶¶ 8, 10. Tequilas labeled "100% de Agave" command substantial price premiums, because they signify that the product is unadulterated with non-agave alcohol. *Id.* ¶¶ 59–70. Between 2019 and 2025, fourteen Plaintiffs across nine states purchased Kirkland Tequila Products in reliance on the "100% de Agave" label claims. *Id.* ¶¶ 25–39. Despite labeling and advertising Kirkland Signature Tequila as "100% de Agave," Plaintiffs allege that Costco sells Tequila that contains cheaper, non-agave alcohol, thereby misleading consumers. *Id.* ¶ 1. Plaintiffs also allege that, had they known the truth, they either would not have purchased the product or would have paid materially less for it. *Id*. ¶¶ 25–39.

According to the amended complaint, Costco participated in a so-called "Adulterated Tequila Enterprise," the common purpose of which was to "ensure[] that Costco obtained a false certification of Kirkland Tequila Products as '100% de Agave' [T]equila in order to sell them in the United States at a premium price." Dkt. No. 25 ¶ 132. Plaintiffs allege that "[m]embers of the Adulterated Tequila Enterprise include Costco, Santa Lucia Corporate Distillery a.k.a. Santa Lucia, S.A. de C.V. ('Santa Lucia'), and other individuals and entities, including unknown third parties, involved in producing, verifying, bottling, labeling, certifying, marketing, advertising, and

[1] For purposes of resolving the motion to dismiss, the Court assumes the truth of the facts alleged in the operative complaint. *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001).

selling Kirkland Tequila Products." *Id.* ¶ 130. Plaintiffs ask the Court to certify the proposed Classes, enjoin Costco from engaging in the allegedly unlawful conduct, and award Plaintiffs and the Classes punitive damages, statutory damages, costs, and disgorgement in an amount to be determined at trial. *Id.* at 63–64.

**A. Tequila Production, Labeling, and Regulation.**

Because the details of Tequila production and regulation are relevant to resolving this motion, the Court provides an overview here.

Tequila is a product of origin; that is, it can only legally be made in Mexico. Dkt. No. 25 ¶ 41. Tequila production is governed by Mexico's Tequila specification, NOM-006-SCFI-2012-Alcoholic Beverages-Tequila-Specifications ("Tequila NOM").[2] The Tequila NOM defines two Tequila categories: (1) "100% agave" and (2) "Tequila." *Id.* ¶ 44.[3] This case concerns the "100% agave" Tequila category, which restricts the source of sugars used in fermentation to 100% Blue Weber agave grown in specific regions of Mexico. *See id.* ¶ 45; *see also* Tequila NOM §§ 5.1.1–2. Specifically, a product labeled "100% agave [azul]" or "100% de agave" is "a product whose fermentation may not be enhanced with sugars other than those obtained from the tequilana weber blue variety Agave," which is only grown in specific territories in Mexico. Dkt. No. 25 ¶ 43 (citing Tequila NOM § 5.1.1.). The presence of non-agave sugars in products labeled "100% agave" or

---

[2] "NOMs are Mexican Official Standards, essentially technical regulations including labeling requirements, issued by government agencies and ministries. Compliance is mandatory." 5 Eckstrom's Licensing: Joint Ventures § 26:107 (updated Aug. 2026); *see also* William D. Signet, *Official Mexican Norms and Mexican Normalization: The Ticket to Modernization in an Emerging Economy?*, 29 U. Miami Inter-Am. L. Rev. 253, 262 (1998) ("NOMs may best be defined as federal compulsory standards imposed on products, services, processes, activities, and work-place conditions in Mexico that are issued by departments of the Mexican federal government under authority of the Normalization Law.").

[3] The Court incorporates by reference the Tequila NOM. Under the doctrine of incorporation by reference, a court deciding a motion to dismiss on the pleadings may consider documents to which the complaint refers extensively or those that "form[] the basis of the plaintiff's claim." *United States v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003). Because the amended complaint repeatedly cites and refers to the Tequila NOM, the Court will consider it at this stage.

"100% de agave" constitutes adulteration. *Id.* ¶ 48. By contrast, regular "Tequila" may have "other sugars in a proportion not to exceed 49% of total reducing sugars expressed in units of mass." *Id.* ¶ 44. Tequila labeled "100% de Agave" thus commands premium pricing. *Id.* ¶¶ 59–70.

The manufacturing and production of Tequila is regulated by a Mexican entity known as the Conformity Assessment Body ("CRT"). Dkt. No. 25 ¶ 41. The CRT "[g]uarantee[s] the authenticity of Tequila to the consumer" (*id.*), and "ensure[s] that only authentic, unadulterated [T]equila is certified for domestic and international sale." *Id.* ¶ 57. It accomplishes this goal by conducting "extensive inspections throughout the [T]equila production chain," verifying that "only Blue Weber agave cultivated within the designated" regions is used, and performing laboratory testing of Tequila samples to verify key parameters. *Id.* ¶¶ 55–57. The CRT also "owns an incontestable federal registration for the certification mark TEQUILA (Registration No. 5225126)." *Id.* ¶ 58 (citing *Consejo Regulador Del Tequila A.C. v. Additive Free All., Inc.*, Case No. 25-cv-00236-WWB-MCR, 00236-WWB-MCR, Dkt. No. 1, at 6 (M.D. Fla. Mar. 4, 2025)). This means that "only producers certified by the CRT can legally use the term 'Tequila' on products sold in the United States." *Id.* "In other words, CRT's control over the U.S. certification mark, combined with its role under Tequila NOM, makes it the sole gatekeeper for what qualifies as '100% Agave' [T]equila under both Mexican and U.S. law." *Id.*

Here in the United States, the labeling, packaging, and advertising of distilled spirits, including Tequila, is regulated by the Alcohol and Tobacco Tax and Trade Bureau ("TTB"). Dkt. No. 25 ¶ 50. U.S. law requires "Tequila" to be made in accordance with Mexican laws and regulations. *See* 27 C.F.R. § 5.148(b)(1) ("Tequila must be made in Mexico, in compliance with the laws and regulations of Mexico governing the manufacture of Tequila for consumption in that country."). Tequila importers must possess "a Certificate of Tequila Export issued by an official

duly authorized by the Mexican Government or a conformity assessment body [i.e., the CRT] stating that the product is entitled to be designated as Tequila under the applicable laws and regulations of the Mexican Government" to import the Tequila product into the United States. 27 C.F.R. § 5.30(d)(1). Importers must then secure Certificates of Label Approvals ("COLAs") from the TTB to sell the imported Tequila in the United States. 27 C.F.R. § 5.24. These certificates issue only if the label "complies with applicable laws and regulations." 27 C.F.R. § 13.21(a).

This regulatory process applies to Costco's Kirkland Tequila Products. Costco outsources the production of its Tequila to Santa Lucia, a distillery located in Tesistán, Jalisco, Mexico. Dkt. No. 25 ¶ 135. A third entity, MPL Brands NV Inc. ("MPL") imports the finished Tequila into the United States once certified by the CRT. *Id.* Once in the United States, the Products must secure COLAs from the TTB before they may be sold.

**B. SNIF-NMR Testing**

Plaintiffs' allegations of adulteration are premised on the results of a testing methodology known as Site-Specific Natural Isotope Fractionation-Nuclear Magnetic Resonance ("SNIF-NMR") analysis. Dkt. No. 25 ¶ 72. SNIF-NMR testing "identifies the plant origin of ethanol in a spirit by measuring the natural carbon fingerprint of the ethanol in the spirit. This fingerprint—known as a stable carbon isotope ratio ($\delta^{13}C$)–can be used to identify the plant source of the sugars used in fermentation." *Id.* ¶ 74. In the context of Tequila, the testing "allows researchers to scientifically determine whether a [T]equila labeled as '100% de Agave' derives its alcohol solely from agave sugars or from some other source." *Id.* ¶ 75.

The amended complaint points to numerous studies recognizing SNIF-NMR testing as a method "to differentiate authentic 100% agave tequila." Dkt. No. 25 ¶ 77. A 2021 peer-reviewed study, for example, confirmed that "ethanol from pure agave sources consistently fell within the expected $\delta^{13}C$ ranges, while ethanol from $C_4$ plants, like cane and corn, displayed more negative

values" and thereby "established precise benchmarks—$CH_2$ values below—10.0% are likely indicative of non-agave origin." *Id.* ¶ 78 (citing Vincent Portaluri et al., *Authentication of Agave Products through Isotopic Intramolecular $^{13}C$ Content of Ethanol: Optimization and Validation of $^{13}C$ Quantitative NMR Methodology*, 1 ACS FOOD SCI. TECH. 1316, 1316–17 (2021)).

Plaintiffs commissioned a lab to conduct SNIF-NMR testing of samples taken from Kirkland Tequila Products purchased from various Costco stores. Dkt. No. 25 ¶¶ 13–14, 72; *see also* Dkt. Nos. 25-1, 25-2 (Plaintiffs' SNIF-NMR testing results). According to these lab results, "[n]one of the tested samples from any of the Plaintiffs met the threshold for ethanol derived entirely from agave sugars." *Id.* ¶ 85. The amended complaint summarizes the testing results as follows:

> Products purchased from Costco in Florida in November 2025 were tested and yielded the following results, all reflecting adulteration:
>
> **Kirkland Blanco**: $\delta^{13}C_CH2 = -11.8‰$
> **Kirkland Reposado**: $\delta^{13}C_CH2 = -12.4‰$
> **Kirkland Extra Anejo**: $\delta^{13}C_CH2 = -13.6‰$
>
> Additional Products purchased from Costco in California in August 2025 were tested and yielded the following results:
>
> **Kirkland Blanco**: $\delta^{13}C_CH2 = -11.8‰$
> **Kirkland Reposado**: $\delta^{13}C_CH2 = -12.8‰$
>
> Further, Plaintiff Jordan Leventhal purchased a bottle of reposado [T]equila at a Costco in Altamonte Springs, Florida, and a lab sample report from this bottle stated the sample's isotopic parameters did not match the data for authentic 100% or 51% agave tequila because it contained $\delta^{13}C_CH2 = -12.2‰$
>
> Plaintiff Ariel Glazer purchased a bottle of Kirkland Reposado [T]equila from a Costco in Royal Palm Beach, Florida, and a lab sample report from that bottle stated the sample's isotopic parameters did not match the data for authentic 100% or 51% agave [T]equila because it similarly contained $\delta^{13}C_CH2 = -12.2‰$.
>
> *Id.* ¶¶ 81–84 (citing Dkt. Nos. 25-1, 25-2).

Plaintiffs allege that "[t]hese testing results implicate the entire range of Products as they are created from the same base spirit and Defendant's conduct, the adulteration of the Products, is so widespread that it affects all Products." Dkt. No. 25 ¶ 86.

**C. Mexican Proceedings**

Similar claims of adulteration involving Kirkland Tequila Products based on the results of SNIF-NMR were brought in two proceedings in Mexico. The Court briefly describes those here.[4]

1. DGN Proceeding

The first Mexican proceeding involved the Dirección General de Normas (General Directorate of Standards or "DGN") of Mexico's Secretaría de Economía (Secretary of Economy). The DGN is a regulatory body tasked with "issu[ing] and administer[ing] binding standards, structur[ing] regulated markets, defin[ing] compliance obligations, and oversee[ing] enforcement through verification and conformity assessment." Dkt. 31-13 at 8. In the context of Tequila regulation, "the DGN is the federal authority responsible for establishing, administering, and enforcing the legal and technical framework governing Tequila in Mexico." *Id.* at 11. "Acting pursuant to the Law on Quality Infrastructure, the DGN exercises regulatory authority over the development, interpretation, and application of NOMs, including the Tequila NOM, which sets forth the mandatory specifications for Tequila production, testing, bottling and labeling." *Id.*

Agaveros 100 Por Ciento de Origen Mexicano ("Agaveros"), a private entity, filed a complaint against the CRT with the DGN, alleging that several 100% agave Tequila brands—including Kirkland Signature Tequila—did not comply with the Tequila NOM, and that the CRT violated Mexican law by certifying this Tequila as 100% agave. Dkt. No. 31-3 at 2. The complaint relied on the results of SNIF-NMR testing to demonstrate purported adulteration of the Tequila

[4] The details of these proceedings come from various exhibits attached to Costco's motion to dismiss. As the Court explains in Section IV.A, the Court takes judicial notice of these exhibits and considers them for the purpose of resolving the motion to dismiss.

brands at issue. As part of the proceeding, the DGN solicited input from both the CRT and the Centro Nacional de Metrología ("CENAM"), Mexico's "national reference laboratory for measurements" (Dkt. No. 25 ¶ 73), regarding their views on SNIF-NMR testing. Dkt. No. 31-3 at 3. CENAM concluded it "could not endorse the reliability" of SNIF-NMR testing, where "it is neither a primary nor a validated method for determining the organic origin in the alcohol beverage known as [T]equila." *Id.* The CRT denied all allegations and similarly stated that SNIF-NMR testing "lacks the capability to distinguish among agave varieties" and "is not provided for" in the Tequila NOM. *Id.* The CRT also submitted its own lab results demonstrating that the challenged products complied with the specifications of the Tequila NOM. *Id.* at 4.

On October 27, 2025, the DGN issued its decision ("DGN Decision"). The DGN ultimately concluded that SNIF-NMR testing was not "competent or sufficient evidence to establish non-compliance" with the Tequila NOM. Dkt. No. 31-3 at 4. Specifically, the DGN explained that the methodology "lacks recognized metrological traceability, is not an internationally accepted reference method for determining the origin of the alcohol in [T]equila, and its use is limited to semi-quantitative determinations in other products." *Id.* The DGN therefore dismissed the complaint as "inadmissible and unfounded," finding "no regulatory infraction exists that would warrant further administrative action," where there was no established violation of the Quality Infrastructure Law or the Tequila NOM. *Id.* at 4–5.

2. <u>FGR Proceeding</u>

The second proceeding is a Ruling Not to Prosecute issued by the Fiscalía General de la República (Office of the Attorney General of Mexico or "FGR") in 2025.

On September 23, 2025, an individual named Remberto Galván Cabrer, the leader of Agaveros, filed a criminal complaint in Mexico, claiming that testing results showed adulteration in the same Tequila brands at issue in the DGN Proceeding, including in Kirkland Signature

Products. Dkt. No. 31-23 at 2. The complaint, which was brought against various businesses including "COSTCO DE MEXICO, S.A. de C.V.," alleged that the products "d[id] not comply with Official Mexican Standards and therefore contravene the provisions of the General Health Law … as … adulterated beverages." *Id.* at 2. The complaint relied on the results of SNIF-NMR testing conducted by Eurofins Laboratory and the Center for Applied Innovation in Competitive Technologies ("CIATEC"). *Id.* at 9.

As part of its investigation, the FGR solicited a response from the CRT, which stated that the batches of the challenged Tequila products had been verified as compliant with the Tequila NOM. Dkt. No. 31-23 at 7. The CRT also explained that "the analyses carried out by the mentioned laboratories by the complainant are neither suitable nor valid under Mexican regulations" where they "were carried out outside the conformity assessment procedure provided for in the Quality Infrastructure Law" and the Tequila NOM. *Id.* The FGR also considered the DGN's reasoning and determinations contained in the prior DGN proceeding. *Id.* at 7–8, 11.

Considering "the sum of th[e] evidence" before it, the FGR ultimately decided not to prosecute. Dkt. No. 31-23 at 8. As relates to SNIF-NMR testing, the FGR concluded that it was not "effective in justifying any non-compliance with [the Tequila NOM] or the General Health Law," explaining:

> [N]one of the evidence provided by the accuser in this investigation is suitable or relevant to justify the element of "adulteration" on a prima facie basis, especially the laboratory analysis issued by CIATEC and Eurofins, since these institutions are not certified by the EMA or approved by the DGN to carry out such analyses. Furthermore, when conducting their analyses, these institutions used methods other than those specified in [the Tequila NOM].
>
> *Id.* at 11.

The FGR instead relied on the CRT lab analyses of the challenged Tequila products, which showed that the batches "did not exceed maximum permitted limits for methanol established in the [Tequila NOM]." *Id.* at 10.

**D. Procedural History**

Plaintiffs sued Costco on November 14, 2025. Dkt. No. 1. Plaintiffs then filed an amended complaint on March 9, 2026 (Dkt. No. 25), after which Costco moved to dismiss the amended complaint on April 21, 2026 (Dkt. No 32). Costco simultaneously filed a motion requesting judicial notice of various exhibits, as well as a Rule 44.1 notice of intent to rely on foreign law. Dkt. No. 31. The Court heard argument from the parties on September 15, 2025. Dkt. No. 48. This matter is now ripe for the Court's review.

## II. JURISDICTION

The Court has subject matter jurisdiction over this case under 28 U.S.C. § 1331 because Plaintiff alleges RICO Act violations. 18 U.S.C. § 1962(c)–(d). The Court has supplemental jurisdiction over Plaintiffs' state law claims which form the "same case or controversy[.]" 28 U.S.C. § 1367.

## III. LEGAL STANDARD

In deciding a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a court examines the complaint to determine whether, if the facts alleged are true, the plaintiff has stated "a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). To state a plausible claim, plaintiff must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.*

## IV. ANALYSIS

### A. The Court will consider Costco's exhibits.

First, the Court must consider whether, in resolving Costco's motion to dismiss, it may consider certain exhibits attached to Costco's motion. Costco seeks judicial notice of certain materials and also provides Rule 44.1 notice of its intent to rely on Mexican law and regulations for its defenses in this action. Dkt. No. 31. The Court addresses both requests below.

1. <u>Judicial Notice</u>

"Generally, district courts may not consider material outside the pleadings when assessing the sufficiency of a complaint[.]" *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 998 (9th Cir. 2018). Federal Rule of Evidence 201, however, creates an exception that permits courts to take judicial notice of adjudicative facts "not subject to reasonable dispute." *Id.* at 999 (quoting Fed. R. Evid. 201(b)). A fact is "not subject to reasonable dispute" if it "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b)(2). Though a court may take judicial notice of undisputed facts contained in public records, it "cannot take judicial notice of disputed facts contained in such public records." *Khoja*, 899 F.3d at 999.

Defendants seek judicial notice of eleven exhibits. *See* Dkt. No. 31. At oral argument, Costco identified four among these eleven as the "key documents" relevant to the Court's inquiry. Dkt. No. 49 at 7. Accordingly, the Court limits its analysis to these four documents and **DENIES** as moot the request for judicial notice as to the remaining documents, upon which the Court does not rely in resolving the motion to dismiss. *See id.* (counsel for Costco explaining that "the request for judicial notice was holistic and does include documents perhaps the court does not need for the dismissal motion"). *See, e.g.*, *In re Natera Prenatal Testing Litig.*, 664 F. Supp. 3d 995, 1004 (N.D. Cal. 2023) ("Because the Court did not consider these materials in reaching the conclusions

set forth below, Natera's request for judicial notice is denied as moot."); *Norton v. LVNV Funding, LLC*, 396 F. Supp. 3d 901, 909 (N.D. Cal. 2019) (similar).

**Exhibit C (Dkt. No. 31-3).** Exhibit C is an official copy of the DGN Decision issued on October 27, 2025, where the DGN concluded that SNIF-NMR testing was not adequate evidence to prove non-compliance with the Tequila NOM and dismissed the complaint as inadmissible and unfounded. The exhibit contains a certification by a notary public, authenticating the document as a true copy of the original document issued by the DGN.

Plaintiffs oppose judicial notice of this exhibit, arguing that Costco asks the Court "to accept as true the substantive conclusions reflected" therein, including the DGN's conclusions regarding the sufficiency and reliability of SNIF-NMR testing. Dkt. No. 37 at 4–5. Costco, for its part, contends that it "is not requesting the Court establish as fact the truth of the matters asserted in the prior Mexican proceedings." Dkt. No. 42 at 5–6.

The Court will **GRANT** Defendant's motion to take judicial notice of Defendant's Exhibit C (Dkt. No. 31-3). Courts routinely take judicial notice of records of other courts, including both domestic and foreign court records. *See, e.g.*, *Smith v. Limerick*, No. 23-35476, 2024 WL 4211479, at *1 (9th Cir. Sept. 17, 2024) (district court did not abuse its discretion by taking judicial notice of public records of other court proceedings, where the court relied on the records "only to notice that certain claims had been litigated previously and that those cases had resulted in [certain] judgments"); *Mogan v. Airbnb, Inc.*, No. 23-55489, 2024 WL 3738480, at *3 (9th Cir. Aug. 9, 2024) (similar); *see also Color Switch LLC v. Fortafy Games DMCC*, 377 F. Supp. 3d 1075, 1089 n.6 (E.D. Cal. 2019) (judicially noticing foreign court documents). In doing so, however, courts do not "adopt [any] factual findings" contained in the records or accept the truth of statements therein—they simply take notice of the "existence and contents" of the records. *California ex rel. Lockyer v. Mirant Corp.*, 266 F. Supp. 2d 1046, 1053 (N.D. Cal. 2003); *see also Dutrisac v.*

*STMicroelectronics, Inc.*, No. 23-CV-06639-BLF, 2024 WL 3646949, at *4 (N.D. Cal. Aug. 2, 2024) ("It is well settled that, even though a court may take judicial notice of the existence of another court's opinion or filings in related proceedings, the court cannot accept as true facts found or alleged in such documents.").

**Exhibit M-10 (Dkt. No. 31-23).** Exhibit M-10 is an official translated copy of the FGR's Ruling Not to Prosecute issued on October 27, 2025. Plaintiff objects to judicial notice of the exhibit, again arguing that the document goes to disputed factual matters—namely, the validity of SNIF-NMR testing and whether it can establish Tequila adulteration. Dkt. No. 37 at 10. The Court will take judicial notice of Exhibit M-10, where it is an authenticated public record of a Mexican proceeding.[5] As with Exhibit C, the Court acknowledges Plaintiffs' objections and simply takes notice of the "existence and contents" of the record, but does not adopt the factual findings therein. *See Mirant Corp.*, 266 F. Supp. 2d at 1053.

**Exhibit G (Dkt. No. 31-7).** Exhibit G is a publicly available United States Patent and Trademark Office ("USPTO") issued certification mark for Tequila. Plaintiffs argue that the document is not relevant because it does not "concern[] the sufficiency of Plaintiffs' allegations or any issue the Court must resolve in deciding Costco's motion to dismiss." Dkt. No. 37 at 3. Yet Plaintiffs themselves reference the certification mark in their amended complaint, explaining that it is owned by the CRT, such that "only producers certified by the CRT can legally use the term 'Tequila' on products sold in the United States." Dkt. No. 25 ¶ 58. The Court therefore finds the exhibit relevant where it bears on the CRT's role in the Tequila production and certification process. The Court therefore **GRANTS** Defendant's motion to take judicial notice of Defendant's Exhibit G (Dkt. No. 31-7).

[5] Exhibit M-10 is also properly noticed as a foreign law material as it is an official ruling from the Mexican Attorney General.

**Exhibit J (Dkt. No. 31-10).** Exhibit J is a U.S. government website allowing consumers to file complaints related to alcoholic beverage products, including for suspected "contaminat[ion] or adulterat[ion]." Dkt. No. 31-10 at 2. Again, Plaintiffs' sole challenge to this exhibit is on relevance grounds. Dkt. No. 37 at 3. The Court agrees with Costco that "[t]he existence of formal regulatory mechanisms for reviewing adulteration complaints is relevant," Dkt. No. 42 at 4, particularly as relates to the international comity analysis. *See* Section IV.B. The Court therefore **GRANTS** Defendant's motion to take judicial notice of Defendant's Exhibit J (Dkt. No. 31-10).

2. Rule 44.1 Notice of Intent to Rely on Foreign Law

Costco also provides notice of its intent to rely on Mexican law and regulations for its defenses in this action. Dkt. No. 31 at 6–8. Federal Rule of Civil Procedure 44.1 requires a party intending to raise an issue about a foreign country's law to "give notice by pleading or other writing." Fed. R. Civ. P. 44.1. When "determining foreign law," courts are authorized "to consider any relevant material or source, including testimony, whether or not submitted by a party or admissible under the Federal Rules of Evidence." *Id.*; *see also Radu v. Shon*, 62 F.4th 1165, 1174 (9th Cir. 2023) ("[A] district court's selection of methods to evaluate foreign law is discretionary." (citation omitted)). "[A] party relying on foreign law has an obligation to raise the specific legal issues and to provide the district court with the information needed to determine the meaning of the foreign law." *G & G Prods. LLC v. Rusic*, 902 F.3d 940, 949 (9th Cir. 2018). At the motion to dismiss stage, courts may rule on a question of foreign law by considering "[i]ndependent research, plus the testimony of foreign legal experts, together with extracts of foreign legal materials." *de Fontbrune v. Wofsy*, 838 F.3d 992, 997 (9th Cir. 2016). Moreover, "the court is not limited by material presented by the parties; it may engage in its own research and consider any relevant material thus found." Fed. R. Civ. P. 44.1 advisory committee's note to 1966 amendment. That said, "expert testimony accompanied by extracts from foreign legal materials

has been and will likely continue to be the basic mode of proving foreign law." *Universe Sales Co., v. Silver Castle, Ltd.*, 182 F.3d 1036, 1038 (9th Cir. 1999).

Plaintiffs contend that the Court should reject these foreign law materials, arguing that they improperly seek resolution of disputed factual issues. Dkt. No. 37 at 7–11. The Court addresses Costco's foreign materials below.

**Exhibit M and attachments M-1 through M-10 (Dkt. Nos. 31-13–23).** Exhibit M (Dkt. No. 31-13) is a declaration on Mexican laws and regulations applicable to the production of Tequila by expert Francisco Javier Zenteno Barrios ("Zenteno Barrios Declaration"). Mr. Zenteno Barrios is a Mexican attorney and law professor with over 40 years of legal experience. His declaration addresses the structure, authority, and legal effect of Mexican regulatory and prosecutorial institutions. Exhibits M-1 through M-10 contain Mexican statutes, regulations, and authorities that Mr. Zenteno Barrios relied upon in his declaration. Plaintiffs object to the Zenteno Barrios Declaration, arguing that it exceeds the proper scope of Rule 44.1 where it improperly advocates merits conclusions and seeks to persuade the Court how disputed facts should be evaluated. Dkt. No. 37 at 8–10.

The Court will consider the Zenteno Barrios Declaration and attachments for the limited purpose of understanding the respective roles and authorities of the DGN, FGR, and CRT within Mexico's regulatory regime. As the Ninth Circuit has explained, "expert testimony accompanied by extracts from foreign legal materials has been … the basic mode of proving foreign law." *Universe Sales Co.*, 182 F.3d at 1038. However, the purpose of evidence from foreign law experts submitted pursuant to Rule 44.1 is to aid a court's understanding of foreign law. As such, "foreign law experts may not opine as to the ultimate application of the foreign law to the facts of the case." *EduMoz, LLC v. Republic of Mozambique*, 968 F. Supp. 2d 1041, 1052 (C.D. Cal. 2013), *aff'd*, 686 F. App'x 486 (9th Cir. 2017); *see also Krish v. Balasubramaniam*, No. 06–CV–

01030 OWW, 2006 WL 2884794, *3 (E.D. Cal. Oct. 10, 2006). Plaintiffs' objection is thus sustained to the extent Zenteno Barrios Declaration contains any such impermissible legal opinions.

The Court now turns to Costco's motion to dismiss.

**B. The Court declines to exercise jurisdiction over this case under the doctrine of international comity.**

Costco first argues that the Court should apply the doctrine of international comity and decline to exercise jurisdiction over this action. Dkt. No. 32 at 16–20. For the reasons stated below, the Court agrees.

"International comity is the recognition which one nation allows within its territory to the legislative, executive or judicial acts of another nation, having due regard both to international duty and convenience, and to the rights of its own citizens or of other persons who are under the protection of its laws." *Cooper v. Tokyo Elec. Power Co. Holdings, Inc.*, 960 F.3d 549, 565–66 (9th Cir. 2020) (citation modified). "It is 'a doctrine of prudential abstention, one that counsels voluntary forbearance when a sovereign which has a legitimate claim to jurisdiction concludes that a second sovereign also has a legitimate claim to jurisdiction under principles of international law.'" *Id.* at 566 (quoting *Mujica v. AirScan Inc.*, 771 F.3d 580, 598 (9th Cir. 2014)). The doctrine "embodies the policy of 'good neighborliness, common courtesy and mutual respect between those who labour in adjoining judicial vineyards.'" *Id.* (quoting *Mujica*, 771 F.3d at 598).

There are two kinds of international comity: "prescriptive comity (addressing 'the extraterritorial reach of federal statutes') and adjudicative comity (a 'discretionary act of deference by a national court to decline to exercise jurisdiction in a case properly adjudicated in a foreign state')." *Cooper*, 960 F.3d at 566 (quoting *Mujica*, 771 F.3d at 598–99). This case only involves the latter. In cases involving adjudicative comity, "deference to the foreign court is appropriate so

long as the foreign proceedings are procedurally fair and … do not contravene the laws or public policy of the United States." *Mujica*, 771 F.3d at 599. The party asserting internationality comity "bears the burden of proof." *Cruz v. United States,* 387 F. Supp. 2d 1057, 1069 (N.D. Cal. 2005) (citing *In re Grand Jury Proceedings*, 40 F.3d 959, 964 (9th Cir. 1994)).

According to Costco, adjudicatory international comity applies here where Mexico, through the DGN, has "already rejected" the claims underlying Plaintiffs' lawsuit—i.e., the "SNIF-NMR-proves-adulteration claims relating to Kirkland Signature Tequila" and that the CRT improperly certified these products as "100% de Agave." Dkt. No. 32 at 18–19. Costco further contends that abstention is warranted "out of respect for Mexico and its recognized authority over Tequila production, certification, and labeling." *Id.* at 19. Plaintiffs, on the other hand, argue that this Court must retain jurisdiction, where there is no "Mexican judicial proceeding, compensation scheme, or administrative mechanism through which Plaintiffs could pursue their U.S. consumer-protection, fraud, and RICO claims against Costco." Dkt. No. 36 at 15–16.

Courts assess the following factors when deciding whether to apply adjudicative comity: "[1] the strength of the United States' interest in using a foreign forum, [2] the strength of the foreign governments' interests, and [3] the adequacy of the alternative forum." *Mujica*, 771 F.3d at 566. The Court addresses each of these factors and concludes that international comity abstention is warranted here.

1. <u>The strength of the United States' interest in using a foreign forum</u>

In considering the United States' interest, courts look to the following nonexhaustive factors: (1) the location of the conduct in question, (2) the nationality of the parties, (3) the character of the conduct in question, (4) the foreign policy interests of the United States, and (5) any public policy interests. *Mujica*, 771 F.3d at 604.

First, because "comity is most closely tied to the question of territoriality," the Court considers "where the conduct in question took place." *Mujica*, 771 F.3d at 604–05. Plaintiffs contend that the conduct is primarily "domestic" where the "injuries ar[ose] from purchases made in the U.S. after viewing false '100% de Agave' representations in Costco stores and through Costco's marketing." Dkt. No. 36 at 13. While the purchases and marketing took place in the United States, it is undisputed that the majority of the conduct leading up to the sale of the Tequila—including the production, authentication, and certification—occurred in Mexico. Indeed, the purported adulteration of the Tequila, which lies at the heart of the case, would have taken place in Mexico. Moreover, the RICO claim necessarily implicates conduct in Mexico, where it alleges the existence of an "Adulterated Tequila Enterprise" consisting of Santa Lucia (located in Tesistán, Jalisco, Mexico) and "unknown third parties" engaged in conduct—"producing, verifying, bottling, labeling, [and] certifying, … Kirkland Tequila Products"—that all took place in Mexico. Dkt. No. 25 ¶ 130. Thus, while the Court acknowledges that certain marketing and purchasing activity occurred in the United States, it finds that most of the relevant conduct took place in Mexico. Accordingly, this subfactor weights in favor of abstention.

Second, the Court takes "account of whether any of the parties are United States citizens or nationals, and also whether they are citizens of the relevant state." *Mujica*, 771 F.3d at 605. The presence of U.S. nationals in a case can "contribute to [a] finding that there is a 'nexus' between the United States and the parties and claims in a case." *Id*. Here, Plaintiffs are U.S. citizens, and Costco is an American corporation. Thus, this subfactor weighs against abstention.

Third, the Court considers the nature of the conduct at issue. The court asks, "whether the action is civil or criminal; whether it sounds in tort, contract, or property; and whether the conduct is a regulatory violation or is a violation of international norms against torture, war crimes, or

slavery." *Mujica*, 771 F.3d at 606. "The closer the connection between the conduct and core prerogatives of the sovereign, the stronger that sovereign's interest." *Id.*

This is a private civil action between U.S. consumers and a U.S. corporation. The Court agrees with Plaintiffs that the alleged conduct poses "harm[] [to] U.S. consumers," thereby implicating the interests and obligations of the United States in protecting its consumers and ensuring its laws are followed. Dkt. No. 36 at 13. That said, this interest is outweighed by the fact that this case centers on the production and regulation of Tequila, both of which are key "prerogatives" of the Mexican government. *See Mujica*, 771 F.3d at 606; *see also In Re: Vitamin C Antitrust Litig.*, 8 F.4th 136, 161 (2d Cir. 2021) (dismissing on comity grounds despite "economic harm to American consumers" and existence of United States' "substantial interest in the uniform enforcement of its antitrust law"). The third factor also supports abstention.

Fourth, the Court assesses the foreign policy interests of the United States. "Courts have found that U.S. interests weigh against hearing cases where doing so would be harmful to U.S. foreign policy." *Mujica*, 771 F.3d at 606. Costco argues that abstention is warranted where the "United States' longstanding foreign policy to defer to Mexican law on the production and labeling of Tequila is intertwined with the United States' interests in protecting distinctive U.S. products." Dkt. No. 32 at 11. Plaintiffs dispute the existence of any foreign policy interest, where "the U.S. has not issued a statement of interest or otherwise requested that federal courts decline jurisdiction over this action based on foreign policy concerns." Dkt. No. 36 at 14.

The Court concludes that abstention is consistent with the United States' foreign policy of recognizing Mexico as the authority on Tequila production and regulation, as reflected in American trade agreements. According to the United States-Mexico-Canada Agreement ("USMCA"), the "United States shall not permit the sale of any product as Tequila or Mezcal unless it has been manufactured in Mexico in accordance with the laws and regulations of Mexico

governing the manufacture of Tequila and Mezcal." USCMA art. 3.C.2(3); *see also Agreement Between the Office of the United States Trade Representative and the Secretaria de Economía of the United Mexican States on Trade in Tequila* ("Tequila Agreement"), Jan. 17, 2006, art. 1(6) (agreement between the United States and Mexico recognizing Tequila "as a distinctive product of Mexico, manufactured in Mexico in compliance with the laws of Mexico regulating the manufacture of [T]equila[.]").[6] Relatedly, as Costco notes, "the United States has an interest in respecting Mexico's authority over its culturally distinctive product because the United States wants continued reciprocal recognition of its own distinctive products, including Bourbon Whiskey and Tennessee Whiskey." Dkt. No. 32 at 18 (citing USMCA art. 3.C.2(1)). That Tequila regulation and production "are the subjects of diplomatic efforts of the Executive [Branch]" thus counsels against involvement by the judiciary. *World Wide Mins., Ltd. v. Republic of Kazakhstan*, 296 F.3d 1154, 1166 (D.C. Cir. 2002); *see also id.* at 1165 ("[Q]uestioning the export control policies of a foreign state would both disrupt international comity and interfere with the conduct of foreign relations by the Executive Branch."). Accordingly, this subfactor also weighs in favor of abstention.

More generally, the Court finds that respecting Mexican proceedings is important "to foster international cooperation and encourage reciprocal recognition of U.S. judgments in foreign courts." *United States v. One Gulfstream G-V Jet Aircraft*, 941 F. Supp. 2d 1, 8 (D.D.C. 2013); *Lawson v. Klondex Mines Ltd.*, 450 F. Supp. 3d 1057, 1076 (D. Nev. 2020) (retaining jurisdiction would "be harmful to U.S. foreign policy" where reexamination of Canadian court's decision would not foster international cooperation). And while a statement of interest from the United States or a foreign sovereign may be sufficient to demonstrate a pertinent foreign policy interest,

[6] Contrary to Plaintiffs' suggestion (Dkt. No. 36 at 14 n.4), the Court may properly take note of the USMCA as a "matter[] of public record" "whose accuracy cannot reasonably be questioned." *Khoja*, 899 F.3d at 999.

Plaintiffs have provided no authority demonstrating it is necessary. *Cf. World Ass'n of Icehockey Players Unions N. Am. Div. v. Nat'l Hockey League*, 803 F. Supp. 3d 1136, 1187 (W.D. Wash. 2025) (finding foreign policy interests supported abstention even where neither sovereign had issued statement of interest).

Fifth, the Court assesses U.S. public policy interests because "courts will not extend comity to foreign proceedings when doing so would be contrary to the policies or prejudicial to the interests of the United States." *Lawson*, 450 F. Supp. 3d at 1076 (citing *Pravin Banker Associates, Ltd. v. Banco Popular Del Peru*, 109 F.3d 850, 854 (2d Cir. 1997)). The Court is satisfied that extending comity to Mexico in a case centered on the production and certification of Tequila would not conflict with the public policy of the United States. To the contrary, the Court finds that abstention is consistent with public policy, given the United States' express recognition of Mexico's exclusive authority over Tequila production and clear deference to the "laws and regulations of Mexico governing the manufacture of Tequila[.]" 27 C.F.R. § 5.148(b)(1).

On balance, taking into account all five subfactors, four of which support the United States' interest in using a foreign forum, the Court finds that this first factor weighs in favor of abstention.

2. <u>The strength of Mexico's interests</u>

"The proper analysis of foreign interests essentially mirrors the consideration of U.S. interests." *Mujica*, 771 F.3d at 607. "Foreign states, no less than the United States, have legitimate interests in regulating conduct that occurs within their borders, involving their nationals, impacts their public and foreign policies, and implicates universal norms." *Id.*

It cannot be disputed that Mexico has a legitimate interest here. As Plaintiffs acknowledge, "Tequila can only legally be made in Mexico" as a distinctive "product of origin." Dkt. No. 25 ¶ 41. Thus, the Mexican government has established a complex and comprehensive regulatory scheme addressing the production, authentication, certification, and labeling of Tequila. Indeed,

Mexico's role as the authority on Tequila regulation is codified in American law and reflected in our trade agreements. *See* 7 C.F.R. § 5.148(b)(1) ("Tequila must be made in Mexico, in compliance with the laws and regulations of Mexico[.]"); USMCA art. 3.C.2(3) ("[T]he United States shall not permit the sale of any product as Tequila or Mezcal unless it has been manufactured in Mexico in accordance with the laws and regulations of Mexico governing the manufacture of Tequila and Mezcal.").

While Plaintiffs concede that "Mexico has an interest in [T]equila regulation generally," they contend that these interests do not outweigh those of the United States. Dkt. No. 36 at 15. Plaintiffs are correct that the "case concerns products marketed and sold by a U.S. company to U.S. consumers within the U.S. in violation of U.S. laws." *Id.* at 14. But this framing obscures the core of Plaintiffs' claims, which centers on the production and purported adulteration of Tequila—activity which takes places exclusively in Mexico, is governed by a comprehensive Mexican regulatory regime, and is enforced by Mexican entities. *See Freund v. Republic of France,* 592 F. Supp. 2d 540, 578 (S.D.N.Y. 2008) (deferring to French proceedings where "Plaintiffs' claims [we]re inextricably connected to France"), *affirmed sub nom. Freund v. Societe Nationale des Chemins de fer Francais*, 391 F. App'x 939 (2d Cir. 2010). And it ignores the fact that U.S. law is expressly anchored to Mexican law as relates to Tequila production. *See* 7 C.F.R. § 5.148(b)(1).

The Court therefore concludes that Mexico's interests are strong and finds this factor to favor abstention.

3. <u>The adequacy of the alternative forum</u>

In determining the adequacy of the alternative forum, "courts consider decisions rendered by the alternative forum and ask '(1) whether the judgment was rendered via fraud; (2) whether the judgment was rendered by a competent court utilizing proceedings consistent with civilized

jurisprudence; and (3) whether the foreign judgment is prejudicial [and] ... repugnant to fundamental principles of what is decent and just.'" *Mujica*, 771 F.3d at 608 (alterations in original) (citation omitted). The ultimate question boils down to "whether one side has presented specific evidence that the judgment of the alternative forum was significantly inadequate." *Id.*; *see also Belize Telecom, Ltd. v. Gov't of Belize*, 528 F.3d 1298, 1306 (11th Cir. 2008) (finding alternative forum adequate where neither party "argued that the Belizean judgments were rendered via fraud or that the Belizean proceedings lacked any element of civilized jurisprudence").

Plaintiffs have made no allegations that the Mexican proceedings were rendered by or subject to fraud. Instead, Plaintiffs contend that the DGN/CRT process "is a *regulatory compliance* mechanism for authenticating and enforcing production standards, not a judicial or compensatory mechanism for defrauded U.S. consumers," and is therefore insufficient for comity purposes. Dkt. No. 36 at 15–16. The Court is not persuaded. It is true that "cases considering international comity have generally occurred in the context of whether to abstain out of deference to a foreign court, not an administrative body." *Marti v. Iberostar Hoteles y Apartamentos S.L.*, 54 F.4th 641, 650 n.6 (11th Cir. 2022) (citing cases). But the doctrine is not so limited. Instead, a defendant invoking the doctrine must simply point to some "legislative, executive or judicial act[]" to which the Court should show deference. *Mujica*, 771 F.3d at 597; *see also One Gulfstream G-V*, 941 F. Supp. 2d at 9 (explaining that a defendant must point to "a valid legal proceeding to which the court must defer"). Thus, federal courts also consider "foreign statutory or regulatory enactments … through the lens of comity." *Doubleline Cap. LP v. Odebrecht Fin., Ltd.*, No. 17CV4576GHWBCM, 2021 WL 4596561, at *9 (S.D.N.Y. Oct. 6, 2021); *see also United States v. Portrait of Wally*, 663 F. Supp. 2d 232, 248–49 (S.D.N.Y. 2009) ("International comity requires recognition of *foreign actions, decrees, and proceedings* that do not conflict with the interests or policies of the United States." (emphasis added) (citation omitted)).

The Court concludes that the DGN Decision is a valid decree issued by a Mexican administrative body to which it may defer. In the context of Tequila regulation, "the DGN is the federal authority responsible for establishing, administering, and enforcing the legal and technical framework governing Tequila in Mexico." Dkt. No. 31-13 at 11. "Acting pursuant to the Law on Quality Infrastructure, the DGN exercises regulatory authority over the development, interpretation, and application of NOMs, including the Tequila NOM, which sets forth the mandatory specifications for Tequila production, testing, bottling and labeling." *Id.* As explained in the Zenteno Barrios Declaration, the DGN decision "was not appealed, applied for review, nor challenged in any way," thus rendering it "a final decision" "constitut[ing] a binding and definitive ruling on that matter." *Id.* at 18. Moreover, the DGN proceeding contained numerous hallmarks of a judicial proceeding: it was an adversarial proceeding in which the DGN solicited input from CENAM, and considered evidence from the complainants and from the CRT. Dkt. No. 31-3 at 2–4. In its decision dismissing the complaint, the DGN explained its deliberative process, the evidence considered, and reasoning in support of its conclusions. *Id.* Thus, although it was not issued by a Mexican court, the Court finds the DGN proceeding to be a valid "foreign action[], decree[], and proceeding[]" that it may defer to on international comity grounds. *Cf. Block v. InterOil Corp.*, 373 F. Supp. 3d 683, 691 (N.D. Tex. 2019) (rejecting argument that court should decline to apply international comity on grounds that foreign proceeding was akin to decision by administrative agency, where said proceeding "was adversarial and provided [party] with an opportunity to challenge" arguments and evidence).

More generally, Plaintiffs contend there is no "Mexican judicial proceeding, compensation scheme, or administrative mechanism through which Plaintiffs could pursue their U.S. consumer-protection, fraud, and RICO claims against Costco." Dkt. No. 36 at 15. This argument has some force where Plaintiffs were not parties to either proceeding in Mexico. Rather, the DGN

proceeding was brought by a private Mexican entity against the CRT; and the FGR Ruling resolved a criminal complaint against, among other entities, Costco De Mexica, S.A. de C.V. (a separate legal entity from the Costco named as Defendant here). And as the party asserting the applicability of the international comity doctrine and bearing the burden of proof, Costco has not established that Plaintiffs could pursue these claims in Mexico or that Costco would consent to jurisdiction there.

But even accepting as true Plaintiffs' contention that there is no Mexican forum through which they could pursue these exact claims and seek the same remedies, that is insufficient for the Court to find Mexico to be an inadequate forum. While Mexico's legal approaches for addressing claims of Tequila adulteration may be different from the claims available in this Court, "courts treat[] differences in legal approach cautiously." *Mujica*, 771 F.3d at 607. As the Ninth Circuit has explained, "[e]ven when foreign practices may differ from American ones, we will respect those differences so long as the variance does not violate strongly-held state or federal public policy." *Id.*; *see also Freund,* 592 F. Supp. 2d at 577 (deferring on basis of comity even where foreign "process unquestionably diverge[d] from United States litigation procedures"). Thus, the fact that Mexico "does not offer" the exact "remedy sought by Plaintiffs does not render the [Mexican] legal system inadequate." *Nat'l Hockey League*, 803 F. Supp. 3d at 1189; *see also id.* (explaining that "the lack of remedy against Defendants in Canada stems from the decisions of the Canadian legislature not to codify particular private rights of action, rather than from the inadequacy of the Canadian legal system").

Outside of Mexican proceedings, U.S. consumers may seek recourse by filing complaints alleging adulteration of products such as Tequila or deceptive labeling with the TTB. *See* Dkt. No. 31-10. The Office of the U.S. Trade Representative may then address Tequila complaints with Mexico via the Working Group on Tequila or other mechanisms established in the Tequila

Agreement. *See* Tequila Agreement arts. 5, 7. The existence of these joint and "alternative means for the United States to vindicate" the interests of American consumers, "such as through bilateral diplomatic efforts, multilateral discussions, trade proceedings …, or dispute resolution in another international forum," further undermines the argument that no meaningful alternative forum exists for the claims at issue. *See In Re: Vitamin C*, 8 F.4th at 163.

Ultimately, Plaintiffs do not make any argument suggesting that the Mexican proceedings resulted in "manifest injustice" or violated "fundamental standards of procedural fairness." *Mujica*, 771 F.3d at 614 (citation modified). Accordingly, this factor favors abstention.

In sum, given the strength of the U.S. government's interest in utilizing a Mexican forum, the strength of Mexico's interests in serving as an exclusive forum to adjudicate the standards and regulations for Tequila production, and the adequacy of the Mexican proceedings, the Court concludes that all claims presented in Plaintiffs' first amended complaint are nonjusticiable under the doctrine of international comity.

**C. The act of state doctrine separately warrants dismissal.**

Costco separately seeks dismissal under the act of state doctrine, which "limits judicial interference in foreign relations by precluding adjudication of the sovereign acts of other nations in United States courts." *Sea Breeze Salt, Inc. v. Mitsubishi Corp.*, 899 F.3d 1064, 1067 (9th Cir. 2018).[7] Unlike the doctrine of international comity, "[t]he act of state doctrine is a 'substantive defense on the merits.'" *Id.* at 1068 (citation omitted). Although the Court has determined that international comity abstention applies here, in the interest of completeness, the Court also examines whether dismissal is separately warranted under the act of state doctrine.

[7] The act of state doctrine has been described as "closely related" to or a "manifestation" of international comity. *See In Re: Vitamin C*, 8 F.4th at 162 n.44; William S. Dodge, *International Comity in American Law*, 115 Colum. L. Rev. 2071, 2092 (2015).

"As a doctrinal matter, the 'classic statement' of the act of state doctrine is that 'every sovereign State is bound to respect the independence of every other sovereign State, and the courts of one country will not sit in judgment on the acts of the government of another done within its own territory.'" *Sea Breeze Salt*, 899 F.3d at 1069 (citation omitted). The doctrine "bars suit where (1) there is an official act of a foreign sovereign performed within its own territory; and (2) the relief sought or the defense interposed in the action would require a court in the United States to declare invalid the foreign sovereign's official act." *Royal Wulff Ventures LLC v. Primero Mining Corp.*, 938 F.3d 1085, 1092 (9th Cir. 2019) (citation modified).[8] "The doctrine thus applies when, for example, adjudicating a claim will require invalidating the decision of a foreign court, declaring a permit denial wrongful, assessing the expropriation of property, or evaluating a foreign sovereign's compliance with its own laws." *Alhathloul v. DarkMatter Grp.*, 795 F. Supp. 3d 1253, 1290 (D. Or. 2025) (citations omitted). "Given that a government must always act through agents, it makes no difference for act of state purposes whether that agent is an individual, an agency, or a majority-owned and controlled corporation." *Sea Breeze Salt*, 899 F.3d at 1069; *see also id.* (explaining that "the act of state doctrine may be performed by an instrumentality of a foreign sovereign").

According to Costco, adjudicating Plaintiffs' claims "require[s] inquiry into the validity of Mexico's acts taken in Mexico" (Dkt. No. 32 at 21–22), "which culminated in the specific 100% agave representations Plaintiffs challenge." Dkt. No. 43 at 8. Plaintiffs oppose the application of the doctrine, arguing that Costco cannot establish the requisite elements where "it does not identify

[8] Even when these two mandatory elements are satisfied, the Supreme Court has stated that courts may appropriately look to additional factors—known as the *Sabbatino* Factors—to determine whether application of the doctrine is justified. *See W.S. Kirkpatrick & Co. v. Env't Tectonics Corp., Int'l*, 493 U.S. 400, 409 (1990) (citing *Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398, 428 (1964)). The Court does not find an analysis of the factors necessary here.

an official governmental act whose validity Plaintiffs challenge." Dkt. No. 36 at 18. Although Costco's act of state argument focuses on the actions of the CRT, *see* Dkt. No. 32 at 20–22, the Court also considers the DGN's actions, including the DGN Decision, in its analysis.

1. <u>Whether the actions of the DGN and CRT are "official acts" of a foreign sovereign</u>

The threshold issue is whether the DGN and CRT are "instrumentalities of the foreign sovereign" whose actions are "official acts" for purposes of the doctrine. *See Sea Breeze Salt*, 899 F.3d at 1069. At oral argument, Plaintiffs disputed this conclusion as to the CRT but conceded that the DGN was an instrumentality of the state. Dkt. No. 49 at 44–45. The Court agrees that the actions of the DGN—which is situated within Mexico's Secretariat of Economy (Secretaria de Economía) and functions as "the federal authority responsible for establishing, administering, and enforcing the legal and technical framework governing Tequila in Mexico"—constitute acts of the Mexican government. *See* Dkt. No. 31-13 at 9, 11.

The analysis as to the CRT is less straightforward but yields the same result. Though not entirely clear from their briefing, Plaintiffs' primary argument appears to be that the CRT is not an instrumentality of the state because it is a "nonprofit civil association," "not a government agency." Dkt. No. 49 at 42–43. The Court is not persuaded; first, that the CRT is not an official government agency or entity does not automatically exclude it from the purview of the doctrine. As the Ninth Circuit has explained, "the critical question is not the identity of the actor, but rather the nature of the act itself." *Sea Breeze Salt*, 899 F.3d at 1069. Thus, the doctrine has been extended to the actions of a Mexican salt production corporation where the corporation was majority-owned and controlled by the Mexican government. *Id.*; *see also Int'l Ass'n of Machinists & Aerospace Workers v. Org. of Petroleum Exporting Countries (OPEC)*, 649 F.2d 1354, 1355 (9th Cir. 1981) (applying doctrine to oil-production decisions of the Organization of the Petroleum Exporting Countries ("OPEC") member nations, "notwithstanding the fact that '[t]he OPEC

nations produce and export oil either through government-owned companies or through government participation in private companies'"). And the Seventh Circuit has applied the doctrine to the acts of Canada's provincial Liquor Control Board. *Mountain Crest SRL, LLC v. Anheuser-Busch InBev SA/NV*, 937 F.3d 1067, 1083–84 (7th Cir. 2019).

Here, Plaintiffs' own portrayal of the CRT confirms that its actions are "quintessentially sovereign in nature." *Sea Breeze Salt*, 899 F.3d at 1069. As Plaintiffs allege, the CRT "regulates the manufacturing of [T]equila," and its "core responsibilities" include "enforc[ing]" restrictions around "traditional harvesting practices" associated with growing Blue Weber agave, "conduct[ing] extensive inspections throughout the [T]equila production chain," and "monitoring production practices on-site." Dkt. No. 25 ¶¶ 4, 41, 55–56. Plaintiffs also acknowledge that the CRT acts pursuant to Mexico law, where it is "accredited and approved under Mexico law to inspect, analyze, and certify compliance with the [Tequila NOM]." *Id.* ¶ 54. And they recognize that these certifications carry legal weight, where "only producers certified by the CRT can legally use the term 'Tequila' on products sold in the United States." *Id.* ¶ 58. Plaintiffs' characterization of the CRT is consistent with that of Costco's foreign law expert, who describes "the CRT [as] the accredited and approved certification body within the Tequila regulatory system," which derives its authority from "and remains subject to, the regulatory system established and supervised by the DGN." Dkt. No. 31-13 at 8, 12. Thus, where it is undisputed that the CRT acts as a government-authorized certification body, the Court concludes that the CRT functions as an instrumentality of the state, such that its certification actions constitute official acts of Mexico. *See generally World Wide Mins., Ltd.*, 296 F.3d at 1165 (finding there was "no doubt that issuance of a license permitting the removal of uranium from Kazakhstan is a sovereign act").

2. Whether the relief sought or the defense interposed requires the Court to declare invalid Mexico's official acts

Having settled that the DGN and CRT are instrumentalities of the state whose actions are "official acts," the Court concludes that the second element of the doctrine—whether the relief sought requires the Court to declare invalid the challenged official acts—is also satisfied. *See Royal Wulff Ventures*, 938 F.3d at 1092. The fundamental issue underlying each claim in this case is whether "the Kirkland Tequila Products were adulterated with non-agave alcohols." *See* Dkt. No. 36 at 8 (Plaintiffs identifying this as the first of three "relevant questions" before the Court). Plaintiffs argue in the affirmative, contending that the SNIF-NMR testing results demonstrate evidence of improper adulteration. Dkt. No. 25 at ¶¶ 71–88. Mexico, through a series of sovereign acts, has decided the issue in the negative: the CRT labeled and certified the Kirkland Tequila Products as "100% agave" and issued a Certificate of Tequila Export; and the DGN rejected claims based on SNIF-NMR testing alleging that Kirkland Tequila Products were adulterated and improperly certified by the CRT. Thus, a finding of adulteration in Plaintiffs' favor inescapably conflicts with the official actions of the DGN and CRT. As discussed above, the Tequila NOM—which is issued by the DGN and mandates specifications for Tequila production—makes clear that a product labeled "100% Agave" is "a product whose fermentation may not be enhanced with sugars other than those obtained from the tequilana weber blue variety Agave." Tequila NOM § 5.1.1. A finding from this Court that the Kirkland Tequila Products were adulterated with non-agave alcohols based on the results of SNIF-NMR testing would necessarily imply that the CRT improperly labeled and certified the Tequila as "100% Agave" in violation of the Tequila NOM and Mexican law. And it would conflict with the DGN's conclusion that SNIF-NMR testing is insufficient to establish non-compliance with the Tequila NOM. Dkt. No. 31-3 at 4. In other words, the relief sought by Plaintiffs would require this Court to "declare invalid" Mexico's

"official act[s]." *Royal Wulff Ventures*, 938 F.3d at 1088; *see also id.* (finding act of state doctrine barred investors' action where it would "require a United States court to pass judgment on the validity of a 2012 ruling by the United Mexican States' (Mexico) tax authority").

Plaintiffs contend that their claims do not "challenge any action taken by DGN or CRT" or "depend on the validity of CRT's certification process." Dkt. No. 36 at 16. But this argument is at odds with Plaintiffs own allegations, which describe the CRT as "the *sole gatekeeper for what qualifies as '100% Agave' [T]equila* under both Mexican and U.S. law." Dkt. 25 ¶ 58 (emphasis added). Indeed, the amended complaint is replete with allegations detailing the CRT's status as a regulatory body and its critical role in the Tequila production process. *See, e.g.*, *id.* ¶ 4 (explaining that "restrictions" regulating production of Blue Weber agave "are enforced by Mexico's Tequila Regulatory Council, Consejo Regulador del Tequila, A.C. ('CRT'), and are meant to protect the authenticity and quality of [T]equila"); ¶ 41 (describing the CRT as the body that "regulates the manufacturing of [T]equila"); ¶ 58 ("Because the CRT holds the U.S. certification mark, only producers certified by the CRT can legally use the term 'Tequila' on products sold in the United States."); ¶ 139 ("CRT authorizes [T]equila labels—e.g., '100% de Agave'—and issues Tequila NOM and U.S. Department of Transportation registration numbers."). Plaintiffs cannot on one hand paint the CRT "as the sole gatekeeper for what qualifies as '100% Agave' [T]equila" (*id.* ¶ 58), and on the other disclaim the CRT as irrelevant to their claims alleging adulteration. *Cf. St. Jude Med. S.C., Inc. v. Biosense Webster, Inc.*, No. 14-cv-1326, 2014 WL 12686383, at *12 (C.D. Cal. Aug. 27, 2014) (rejecting argument where "Plaintiffs [were] speak[ing] out both sides of their mouths").

Taking Plaintiffs' own allegations as true, then, the Court concludes that Plaintiffs' claims challenging the "100% Agave" label as false and misleading due to purported adulteration *necessarily* challenge the actions and determinations of the CRT, where it is undisputed that the

CRT is the sole entity authorized to certify the products as "100% Agave." *See* Dkt. No. 25 ¶ 58. And given that Plaintiffs' main evidence of adulteration is the results of SNIF-NMR testing, a judgment for Plaintiffs would necessarily validate that method as appropriate for discerning adulteration—a finding that runs headlong into the DGN's express holding to the contrary. *See generally Mountain Crest SRL*, 937 F.3d at 1084–85 (applying act of state doctrine where it was clear that plaintiff was ultimately seeking "an adjudication that the [rule] established by the [foreign] government is inoperative").

Plaintiffs' reliance on *W.S. Kirkpatrick & Co., Inc. v. Environment Tectonics Corp., Int'l*, 493 U.S. 400 (1990) does not help them. *See* Dkt. No. 36 at 16–17. There, the Supreme Court addressed a situation where the plaintiffs, unsuccessful bidders for a Nigerian government construction contract, brought a RICO action alleging that the defendants had obtained the bid by bribing Nigerian officials in violation of Nigerian law. *Id.* at 402. The district court held that the action was barred by the act of state doctrine because proving that the bribes were paid would necessarily involve an inquiry into the Nigerian government's motivations and may embarrass the Nigerian government or interfere with the execution of American foreign policy. *Id.* at 403. The Supreme Court disagreed, holding that the act of state doctrine was inapplicable where neither the "relief sought" nor "the defense interposed" required a court to declare invalid the Nigerian government's official act approving the contract. *Id.* at 405. The Court cited *Sharon v. Time, Inc.*, 599 F. Supp. 538, 546 (S.D.N.Y. 1984), to emphasize that "[t]he issue in this litigation is not whether [the alleged] acts are valid, but whether they occurred." *See W.S. Kirkpatrick*, 493 U.S. at 406.

By contrast, the "relief sought" by Plaintiffs here—a finding that the Kirkland Tequila Products were adulterated with non-agave alcohols—does require the Court "to declare invalid the official act[s]" of Mexico, which certified the Products as 100% de agave and rejected similar

adulteration claims. *See W.S. Kirkpatrick*, 493 U.S. at 405. Under these circumstances, "allowing Plaintiffs' … claims to proceed would require the evaluation by one sovereign of foreign officers' compliance with their own laws ... because the acts or omissions of the sovereign and the compliance of Mexican officials with Mexican law is the determinative issue on Plaintiffs claim." *Royal Wulff Ventures*, 938 F.3d at 1095; *see also World Wide Mins.*, 296 F.3d at 1165 (applying doctrine where "the relief sought … would require [the court] to question the 'legality' of Kazakhstan's denial of the export license").

In sum, the Court finds that the act of state doctrine applies in this case, where a ruling in Plaintiffs' favor would necessarily invalidate the sovereign acts of Mexico, as exercised through the DGN and CRT. Accordingly, dismissal on this alternate basis is appropriate.

* * * * *

For these reasons, the Court concludes that dismissal with prejudice is warranted under both the international comity and act of state doctrines.[9] The Court declines to grant Plaintiffs leave to amend, because the Court's abstention and act of state findings cannot be cured, such that amendment would be futile. *See Election Integrity Project California, Inc. v. Weber*, 113 F.4th 1072, 1099 (9th Cir. 2024) ("A district court does not abuse its discretion in denying leave to amend where any further amendment to the complaint would likely prove futile." (citation modified)); *see also Lawson*, 450 F. Supp. 3d at 1084 (dismissing with prejudice and declining leave to amend "based [on] the court's abstention and waiver findings"); *World Ass'n of Icehockey Players*, 803 F. Supp. 3d at 1189 (dismissing claims with prejudice and without leave to amend on international comity grounds).

[9] The application of these doctrines dispenses with all of Plaintiffs' claims, including the federal RICO claim, the various state-law claims, and the negligence and unjust enrichment claims, where each claim is premised on the underlying allegation that the Kirkland Tequila Products were adulterated with non-agave alcohols.

## V. CONCLUSION

For the reasons discussed above, the Court GRANTS IN PART and DENIES IN PART Costco's motion for judicial notice (Dkt. No. 31) and GRANTS Costco's motion to dismiss the amended complaint with prejudice (Dkt. No. 32).

Dated this 16th day of October, 2026.

Kymberly K. Evanson
United States District Judge